**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**, | **CRIMINAL ACTION** |
| Plaintiff, |  |
| *v.* | **NO. 11-740-KSM-1** |
| **MATTHEW ACKERMAN,** |  |
| Defendant. |  |

<u>**MEMORANDUM**</u>

**MARSTON, J.**                                                              **August 25, 2020**

Defendant Matthew Ackerman, who is currently serving a 210 month sentence at the Federal Correctional Institution of Danbury (FCI Danbury) for receipt, possession, and conspiracy to receive, distribute, and possess child pornography, filed an emergency motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A).  (Doc. No. 90.)  In seeking a reduction in his sentence, Ackerman asserts that the COVID-19 pandemic, his age, his medical conditions, and the outbreak of COVID-19 at FCI Danbury place him at an increased risk of harm from the virus and, taken together, amount to extraordinary and compelling reasons justifying his release. (*Id.*)  The Government opposes Ackerman's motion, arguing that Ackerman's medical conditions are not significant risk factors for the virus and that, in any event, as a child sex offender, he presents a danger to his community and should not be released.  (Doc. No. 99.)

For the reasons discussed below, the Court denies Ackerman's motion.

I.     **Background**

On August 28, 2012, Ackerman appeared before U.S. District Judge James Knoll Gardner and pled guilty to receipt of child pornography, in violation of 18 U.S.C. § 2252(a)(2),

and possession of child pornography and aiding and abetting, in violation of 18 U.S.C. § 2252(a)(4).[1]  (Pre-sentence Report (PSR) at p. 4, ¶ 1; *see also* Doc. No. 80 at p. 1; Doc. No. 10.)  About one month later, Ackerman entered a guilty plea in the Western District of Virginia, this time for conspiracy to receive, distribute, and possess child pornography, in violation of 18 U.S.C. § 2252(a)(2), (a)(4)(B), (b)(1), and (b)(2).[2]  (PSR at p. 4, ¶ 2.)  The latter case was transferred to the Eastern District of Pennsylvania for sentencing.  (*Id.* at p. 4, ¶ 4.)  On March 20, 2013, Ackerman was sentenced to 210 months' imprisonment, followed by five years of supervised release.  (Sentencing Hearing Tr. at 277:14–284:18; Doc. No. 80 at p. 2.)

The facts surrounding the charges highlight deeply disturbing conduct.  At his change of plea hearing, Ackerman admitted that he and his co-defendant Thomas Syfor used the email address syfor.thomas@yahoo.com to receive and send child pornography.  (Change of Plea Hearing Tr. at p. 104:14–114:21.)  For example, on February 22, 2011, Ackerman sent an email to "Email User-B," attaching four images depicting child pornography and stating "Matt again. I'll send more later."  (*Id.*)  One of the images showed a naked, prepubescent male child lying on his back, and an adult male appeared to be anally penetrating the child.  (*Id.*)  The next day, syfor.thomas@yahoo.com sent three more images to the same user, stating "hope you enjoy ill send more later ok u send to if u have ok i love cum in my mouth i like to get fucked too."  (*Id.*)  One of the images showed two nude, prepubescent males performing fellatio on each other.  (*Id.*)  A few days later, Ackerman received, at the same email address, a 37 second video depicting a naked, minor child with his hands and feet bound together behind his back with rope, and while

---

[1] On August 28, 2012, Ackerman pled guilty to Counts Two and Three of the December 2011 indictment (11-cr-740).

[2] In September 2012, Ackerman pled guilty to Count One of the January 2012 indictment (12-cr-573-02).

the child was bound, an adult male placed his erect penis into the child's mouth.  (*Id.*)

A search warrant executed at Ackerman's home uncovered printed photographs of child pornography, a sampling of which were shown to Ackerman and which Ackerman admitted were his.  (PSR at pp. 6–7, ¶ 18.)  One such image featured a prepubescent child on his knees, with his mouth open, as well as an adult male whose erect penis was pointed at the child's open mouth. (*Id.*)  White fluid was clearly visible across the child's face and mouth.  (*Id.*)

These are just a few examples—it cannot be overstated that there are many, many instances where Ackerman sent, received, traded, or possessed images and videos depicting children engaging in sexual acts.  Indeed, federal agents recovered *thousands* of images of child pornography from the computers seized from Ackerman's home, some of which were sadistic and masochistic images and depicted children in bondage situations, and some of which featured toddler-age children.  (PSR at pp. 7–8, ¶ 20; Mar. 20, 2013 Sentencing Hearing Tr. at pp. 305:11–17.)

The record demonstrates that Ackerman's reprehensible conduct extended even further. Specifically, the search of Ackerman's home revealed that the occupants had set up a tripod to overlook the playground across the street.  (PSR at p. 6, ¶ 17.)  In addition, a seized camera contained pictures of adolescent boys playing on that same playground.  (*Id.*)  Further, Ackerman and Syfor directly engaged in a sexual conversation with a sixteen-year old male via chat and webcam, and also arranged to meet, in person, with an underage boy who they had originally met on-line (though the Lehigh Valley Mall meeting did not ultimately come to fruition—even though Ackerman and Syfor showed up at the mall—because the adolescent approached the wrong adult men).  (*Id.* at p. 8, ¶ 21; Mar. 20, 2013 Sentence Hearing Tr. at 228:20–229:14, 230:11–231:20.)  Ackerman also personally performed sex acts online for minor male children

over a webcam.  (Mar. 20, 2013 Sentencing Hearing Tr. at 229:21–230:5; *see also id.* at 269:1–6 ("This is someone who has actively sought out minors on line, has talked to them sexually, has chatted with them sexually, has performed sex acts in front of them on web camera, has arranged to meet one at the Lehigh Valley Mall.").)

As noted above, Judge Gardner sentenced Ackerman to 210 months' imprisonment, followed by five years of supervised release.  (Doc. No. 80; Mar. 20, 2013 Sentencing Hearing Transcript.)  Ackerman appealed, but the district court's judgment was ultimately affirmed. (Doc. No. 89.)

Ackerman is currently housed at FCI Danbury in Connecticut.  He has served 104 months (approximately 50%) of his 210 month sentence.  (Doc. No. 99 at p. 4.)  His projected release date is October 16, 2026.  (*Id.*)  Ackerman now seeks compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A), contending that his medical conditions (in particular, high blood pressure), his age, and the recent outbreak of the COVID-19 virus at FCI Danbury provide the basis for us to grant his motion.  (Doc. No. 90.)

## II.    Legal Standard

"[A]s a general matter, a court cannot modify a term of imprisonment after it has been imposed without specific authorization."  18 U.S.C. § 3582(c); *see also McMillan v. United States*, 257 F. App'x 477, 479 (3d Cir. 2007).  The compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), as amended by the First Step Act, provides such authorization, "empower[ing] a district court to modify a term of imprisonment on a defendant's motion" after the defendant has exhausted his administrative remedies.[3]  *United States v. Towel*, Criminal Action No. 17-519-6,

---

[3] A defendant may move for compassionate release after he "has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  18 U.S.C. § 3582(c)(1)(A).  Here, the Government concedes that Ackerman has exhausted his administrative

4

2020 WL 2992528, at *3 (E.D. Pa. June 4, 2020); *United States v. Tartaglione*, Criminal Action

No. 15-491, 2020 WL 3969778, at *3 (E.D. Pa. July 14, 2020); *see also United States v.*

*Pangelinan*, Criminal Action No. 17-483, 2020 WL 3892961, at *1 (E.D. Pa. July 9, 2020) ("The

First Step Act's amendments to Section 3582(c) 'allow incarcerated defendants to seek

compassionate release from a court on their own motion, not just through the Bureau of

Prisoners.'" (citations omitted)).

> Under § 3582(c)(1)(A), a court
>
> may reduce the term of imprisonment . . . after considering the factors set forth in
> section 3553(a) to the extent that they are applicable, if it finds that –
>
> (i)      Extraordinary and compelling reasons warrant such a reduction . . .
>
> and that such a reduction is consistent with applicable policy statements issued by
> the Sentencing Commission.

18 U.S.C. § 3582(c)(1)(A); *see also United States v. Pawlowski*, No. 20-2033, 967 F.3d

327, 329 (3d Cir. June 26, 2020).

Congress did not define "extraordinary and compelling reasons," except to advise that

"'rehabilitation [of the defendant] alone' does not suffice." *Towel*, 2020 WL 2992528, at *3

(citing 18 U.S.C. § 944(t)). Instead, Congress delegated that task to the United States Sentencing

Commission. 18 U.S.C. § 944; *see also Tartaglione*, 2020 WL 3969778, at *4. In turn, Section

1B1.13 of the Sentencing Guidelines explains that a sentence reduction under § 3582(c)(1)(A)

may be ordered where a court, after considering the § 3553(a) factors, determines that

"extraordinary and compelling reasons warrant the reduction"; "the defendant is not a danger to

the safety of any other person or to the community"; and "the reduction is consistent with this

policy statement." U.S.S.G. § 1B1.13; *see also Towel*, 2020 WL 2992528, at *3.

---

remedies. (Doc. No. 93.)

The Sentencing Commission's commentary to § 1B1.13 enumerates categories of reasons that qualify as "extraordinary and compelling":  (1) certain serious medical conditions (i.e., a terminal illness or a serious medical condition that "substantially diminishes the ability of the defendant to provide self-care" and "from which he or she is not expected to recover"); (2) the defendant's age (over 65), if he or she is also experiencing a serious deterioration of health and has served at least ten years or 75% of his or her sentence; (3) the defendant's family circumstances; or (4) other reasons as determined by the Director of the Bureau of Prisons (BOP).  § 1B1.13 Application Note 1; *see also United States v. Rodriguez*, Criminal Action No. 17-618, 2020 WL 3447777, at *2 (E.D. Pa. June 24, 2020).  "As a result of amendments to § 3582(c)(1)(A) by the First Step Act, courts now conclude that the catch-all category of 'other reasons' applies not only to the BOP Director, but also to courts." *United States v. Justis*, Criminal Action No. 15-416, 2020 WL 43655596, at *2 (E.D. Pa. July 29, 2020) (citations omitted).

In the context of the COVID-19 pandemic, when considering whether extraordinary and compelling reasons" exist, "courts have generally required defendants to show two things: (1) advanced age or serious medical condition that places them at a high risk of serious complications or death if infected with COVID-19; and (2) a more than mere speculative risk of exposure to the virus at the prison where the inmate is housed." *Id.* at *3 (citation omitted); *see also United States v. Feiling*, Criminal No. 3:19cr112 (DJN), 2020 WL 1821457, at *7 (E.D. Va. Apr. 10, 2020) ("In the context of COVID-19, courts have found extraordinary and compelling reasons for compassionate release where an inmate shows *both* a particularized susceptibility to the disease *and* a particularized risk of contracting the disease at his prison facility." (emphasis added)).  "The defendant bears the burden of proving that extraordinary and compelling reasons

exist." *United States v. Thornton*, Criminal No. 2:18-167-1, 2020 WL 4368155, at *3 (W.D. Pa. July 29, 2020); *Rodriguez*, 2020 WL 3447777, at *4 n.3.

In sum, in evaluating Ackerman's motion for compassionate release, we must consider: (1) whether "extraordinary and compelling" reasons exist to reduce the defendant's sentence; (2) whether the defendant is a danger to the community; and (3) whether the § 3553(a) factors support a sentence reduction. *Justis*, 2020 WL 43655596, at *2 (citations omitted). We address each in turn below.

### III. Discussion

#### A. *Extraordinary and Compelling Reasons*

Ackerman alleges that he suffers from several underlying medical conditions, including high blood pressure, hearing loss, a traumatic brain injury, post-traumatic stress disorder (PTSD), depression, and an unknown skin disorder. (Doc. No. 90 at pp. 7–13.)[4] A review of Ackerman's medical records[5] confirms that Ackerman has been diagnosed with hearing loss, hypertension, glaucoma, and bipolar disorder (*see* Doc. No. 96 at p. 10), as well as depression and a minor intellectual disability (*see id.* at p. 25, 49).

None of Ackerman's medical conditions are recognized by the CDC website as definitively placing him at increased risk of severe illness from the disease. *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last updated Aug. 14, 2020) (last visited Aug. 20, 2020) (explaining that

---

[4] Ackerman also claims that he has experienced symptoms of COVID-19, such as shortness of breath and fatigue. (*Id.* at p. 9.) However, according to his medical records, he has not sought care for those symptoms.

[5] Pursuant to this Court's order, the Government filed Ackerman's medical records under seal. (Doc. No. 96.)

individuals who suffer from certain, specified underlying medical conditions, such as cancer, serious heart conditions, obesity, and Type 2 diabetes, "***are at increased risk*** of severe illness" from the virus).

We recognize that the information and guidance concerning the virus frequently and rapidly changes, but Ackerman's assertion that "high blood pressure has been identified by the CDC as a significant risk factor to contraction and complications related to COVID-19" (Doc. No. 90 at p. 7) is inaccurate. According to the CDC, people with hypertension or high blood pressure "***might be at increased risk*** for severe illness from COVID-19." *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (updated Aug. 14, 2020) (last visited Aug. 20, 2020); *see also* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#serious-heart-conditions ("Having other cardiovascular or cerebrovascular disease, such as hypertension (high blood pressure) or stroke, ***may*** increase your risk of severe illness from COVID-19." (emphasis added)); https://www.cdc.gov/coronavirus/2019-ncov/hcp/faq.html#Patients-with-Hypertension (updated Aug. 4, 2020) (last visited Aug. 20, 2020) ("At this time, people whose only underlying medical condition is hypertension ***might be at increased risk*** for severe illness from COVID-19." (emphasis added)); https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/evidence-table.html (updated July 28, 2020) (last visited Aug. 20, 2020) (stating that there is "mixed evidence" of the impact hypertension has on COVID-19 severity).[6]

---

[6] We acknowledge, however, that an infographic on the CDC website shows that individuals with hypertension who contract COVID-19 are at three times the risk for hospitalization. *See* https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-underlying-medical-conditions.html. Nonetheless, this does not change the CDC's overall guidance, which is that individuals with hypertension "***might be at increased risk***" for severe illness from the virus

Further, Ackerman's medical records show that he has essential hypertension, not pulmonary hypertension.  (*See, e.g.*, Doc. No. 96 at pp. 10–11.)  The distinction is significant— although the CDC has recognized that pulmonary hypertension constitutes a "serious heart condition" that ***increases*** an individual's risk of severe illness from COVID-19, the CDC has explained that hypertension (high blood pressure), on the other hand, only "***might***" increase a person's risk of severe illness.  *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#serious-heart-conditions (updated Aug. 14, 2020) (last visited Aug. 20, 2020) (noting that having a serious heart condition, such as pulmonary hypertension, "***increases*** your risk of severe illness from COVID-19," as compared to "having other cardiovascular or cerebrovascular disease, such as hypertension (high blood pressure)" which, in contrast, has a less definitive impact and "***may*** increase your risk of severe illness from COVID-19" (emphasis added)).  Courts have also recognized the difference between the two.  *See United States v. Nesbitt*, Criminal Action No. 09-181, 2020 WL 3412577, at *2 (E.D. Pa. June 22, 2020) ("While the CDC lists 'pulmonary hypertension' as a potential COVID-19 risk factor, the defendant's most recent medical evaluations from April 2020 indicate that defendant does not have such a condition.  It states that defendant has 'primary (essential) hypertension.'"); *United States v. Thomas*, Case No. 5:13-cr-19, 2020 WL 3895781, at *4 (W.D. Va. July 10, 2020) ("There is a difference between 'essential hypertension' and 'pulmonary hypertension.'  While the CDC lists 'pulmonary hypertension' as increasing the risk for severe COVID-19 infection, it does not list 'essential hypertension.'").

Here, Ackerman's medical records also indicate that his high blood pressure has been treated at FCI Danbury with medication (specifically, amLODIPine).  (Doc. No. 96 at pp. 11,

---

(as compared to those who "***are at increased risk***").

21–22.)  The medical records likewise do not suggest that Ackerman has experienced, or sought care for, any hypertension-specific medical incidents this year.  Nothing in the record before us indicates that Ackerman lacks access to his medication or to appropriate care for his hypertension in prison.[7]  In fact, in his motion, Ackerman admits that he is currently being treated for high blood pressure.  (Doc. No. 90 at p. 7.)

Where, as here, there is no indication that the defendant's hypertension cannot be properly controlled via medication or other appropriate medical care, courts routinely hold that compassionate release is not warranted.  *See Daniels*, 2020 WL 4674125, at *3 ("[The defendant's] hypertension does not warrant compassionate release.") (citing cases); *United States v. Mason*, Criminal No. 18-329, 2020 WL 4034835, at *4 (W.D. Pa. July 17, 2020) ("[The defendant's] hypertension is also not a condition that increases his risk of major complications from COVID-19, or that predisposes him to more readily contract the virus."); *Thomas*, 2020 WL 3895781, at *4 ("Hypertension, or high blood pressure, a condition that the CDC estimates impacts 43.8% of the United States population, alone does not constitute an 'extraordinary and compelling reason.'"); *United States v. Colbert*, Case No. 99-80399, 2020 WL 3529533, at *2 (E.D. Mich. June 30, 2020) ("Hypertension, a condition that affects about 46% of the U.S. adult population . . . [is] not [an] 'extraordinary and compelling' condition[].."); *Nesbitt*, 2020 WL 3412577, at *2–3 ("[The defendant's] hypertension was described as 'mild' and he was prescribed two medications for the condition . . . Based on the current record, defendant has not established that his high blood pressure and related medical conditions constitute a serious medical condition as defined in the Sentencing Guidelines."); *United States v. Wood*, No. 2:12-

---

[7] For example, the medical records show that when an EKG result appeared to be abnormal, another EKG was quickly ordered.  (*Id.* at p. 8.)

CR-00027-JRG-DHI, 2020 WL 3162944, at *2 (E.D. Tenn. June 12, 2020) ("[The defendant's] underlying condition—hypertension—matches none of those that the CDC identifies as likely to put an individual at a heightened risk of severe illness from COVID-19.  While the Court sympathizes with [the defendant's] concerns, it is unwilling to order the release of prisoners whose underlying conditions, based on the CDC's guidelines, do not place them at a greater risk of illness from COVID-19; otherwise, the Court, to be evenhanded, would face the untenable situation of having to release all prisoners with any underlying condition."); *United States v. Hammond*, Criminal No. 18-184, 2020 WL 2126783, at *4 (W.D. Pa. May 5, 2020) ("[The defendant] did not convince the court that his high blood pressure, which is being monitored and stabilized by medication, makes him particularly vulnerable.").

We do not discount Ackerman's concern that his high blood pressure might increase his risk of experiencing severe illness if he were to contract the virus, particularly in a prison environment.  However, we cannot find that the mere possibility that Ackerman might contract COVID-19 and might be more likely to experience complications if he does so amounts to an "extraordinary and compelling reason" justifying his release.  *See United States v. Iorio*, No. 1:08-CR-413, 2020 WL 4530733, at *2 (M.D. Pa. Aug. 6, 2020) ("There is no indication in the record . . . that [the defendant's] condition cannot be adequately controlled during his incarceration, and the court declines to find extraordinary and compelling circumstances based on the potential complications that high blood pressure might create in the event of infection."); *Thornton*, 2020 WL 4368155, at *4 ("The medical records Defendant has provided indicate that Defendant's high blood pressure has been treated at Elkton with medication . . . The records likewise do not document any hypertension-specific incidents requiring medical care during his incarceration . . . The mere chance that Defendant may contract the virus . . . and be more

susceptible to complications if he does so is not enough on its own to demonstrate extraordinary and compelling circumstances supporting release in this case."); *United States v. Roper*, CR 117-035, 2020 WL 4288417, at *1 (S.D. Ga. July 27, 2020) ("Of these, only hypertension is listed by the CDC as a condition that 'might' place a person with COVID-19 'at an increased risk for severe illness.'  However, at this point, the Court cannot conclude that the 'might' category qualifies as an illness as sufficiently serious to warrant compassionate release in and of itself.").

Ackerman, who is 59 years old, also appears to contend that his age presents an extraordinary and compelling reason for release.  (Doc. No. 90 at p. 13.)  First, the Application Notes to the Sentencing Guidelines state that reaching 65 years of age bears on the compassionate release decision, but only to the extent that the defendant is also experiencing a serious deterioration of health and has served at least ten years or 75% of his or her sentence. *See* § 1B1.13 Application Note 1.  But, here, *none* of those conditions is satisfied:  Ackerman has not yet reached the age of 65, he is not experiencing a serious deterioration in his health, nor has he served at least ten years or 75% of his sentence.  *See Tartaglione*, 2020 WL 3969778, at *7 (rejecting the 64-year-old defendant's argument that her age presents an extraordinary and compelling reason for release).

Second, to the extent Ackerman claims that his age heightens his risk of severe complications if he were to contract COVID-19 (Doc. No. 90 at p. 13), we recognize that the CDC has explained that "the risk for severe illness from COVID-19 increases with age."  *See* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (updated Aug. 16, 2020) (last visited Aug. 20, 2020).  Although people in their 50s, such as Ackerman, "are at a higher risk for severe illness than people in their 40s," "people in their 60s or 70s are, in general, at higher risk for severe illness than people in their 50s."  *Id.*  At the top of the

continuum (i.e., those who face "the greatest risk for severe illness") are those aged 85 and older. *Id.* Although we recognize that Ackerman's age of 56 places him at a higher risk of experiencing complications from COVID-19, especially compared to those who are in their forties or younger, he is not in the highest risk age group. *See id.* ("8 out of 10 COVID-19 deaths reported in the U.S. have been in adults 65 years and older."). Ultimately, Ackerman's age does not justify his requested release. *See, e.g.*, *Mason*, 2020 WL 4034835, at *4 ("[A]t age 61, [the defendant] *may* be at higher risk of severe illness should he contract the virus. However, he is less than the designated age 65 at-risk category for COVID-19; thus, his age alone does not justify his requested release."); *United States v. Haney*, 19-cr-541, 2020 WL 1821988, at *5 (S.D.N.Y. Apr. 13, 2020) ("If [the defendant's] age alone were a sufficient factor to grant compassionate release in these circumstances, it follows that every federal inmate in the country above the age of 60 should be forthwith released from detention, a result that does not remotely comply with the limited scope of compassionate release[.]").

In evaluating Ackerman's medical conditions, age, and his overall susceptibility to experiencing complications from contracting COVID-19, we have also considered the impact of the pandemic at FCI Danbury. FCI Danbury has undoubtedly been hard hit by COVID-19. In an April 3, 2020 Memorandum to the BOP Director, Attorney General William Barr identified FCI Danbury as a facility that was "experiencing significant levels of infection" from the COVID-19 pandemic, and he directed the BOP to "move with dispatch in using home confinement, where appropriate to move vulnerable inmates out of those institutions." *Rodriguez*, 2020 WL 3447777, at *1; *see also* https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement_april3.pdf. Further, as the Third Circuit has noted, inmates at FCI Danbury initiated a class action lawsuit against the

prison, challenging its response to the COVID-19 outbreak and seeking habeas relief.
*Pawlowski*, 967 F.3d at 331 n.8 (citing *Martinez-Brooks v. Easter*, No: 3:20-cv-00569, 2020 WL 2405350, at *32 (D. Conn. May 12, 2020)).[8]

However, as courts have recognized, the number of inmates and staff inflicted with COVID-19 at FCI Danbury has improved drastically over the past several months, suggesting that the mitigation efforts the BOP introduced and implemented have been successful. *See United States v. Esparza*, No. 1:16-cr-00122-DAD-BAM, 2020 WL 4805055, at *5 (E.D. Cal. Aug. 18, 2020) ("[I]t appears that in the past two months, the active COVID-19 cases at FCI Danbury have decreased significantly to the point of zero active cases among prisoners incarcerated at the prison. This development has convinced the court that the defendant's medical conditions . . . when considered in combination with the status of the virus outbreak at [FCI Danbury], do not constitute extraordinary and compelling reasons[.]"); *United States v. Gray*, 18-cr-179 (JSR), 2020 WL 4677508, at *1 (S.D.N.Y. Aug. 11, 2020) ("It is true that more than 150 inmates and staff at FCI Danbury have contracted COVID-19, and one inmate died as a result . . . On the other hand, the authorities have now taken corrective measures that have led to only one inmate being currently infected. Furthermore, [the defendant's] argument cuts too broadly, for it would mandate that all defendants at Danbury be released, something not even remotely contemplated by the compassionate release statute."); *United States v. Felix*, No. 12-cr-

---

[8] A tentative settlement agreement has been proposed, which the court considered when granting the petitioner's motion to certify a class for settlement purposes only. *See Whitted v. Easter*, No. 3:20-cv-00569 (MPS), 2020 WL 4605224, at *1 (D. Conn. Aug. 11, 2020); *see also United States v. Davis*, 12-Cr-712 (SHS), 2020 WL 4573029, at *1 (S.D.N.Y. Aug. 7, 2020) ("Further, the conditions at FCI Danbury do not suggest that the prison is 'ill-equipped to properly care for inmates' . . . [T]he BOP has recently reached a tentative settlement 'to assure that a class of inmates who are medically vulnerable' to COVID-19 at the prison 'are being treated or released.' Thus, it appears that the BOP is making appropriate efforts to protect its inmates from the virus." (citations omitted)).

322 (RJS), 2020 WL 4505622, at *2 (S.D.N.Y. Aug. 4, 2020) ("At least one other court in this circuit has recently agreed that the BOP's mitigation strategy at FCI Danbury appears to have been largely successful, which undercuts the argument that circumstances at Danbury specifically present an extraordinary and compelling reason for release.").

Courts in this Circuit have applied similar analyses to other federal correctional institutions that were also highlighted as COVID-19 hot spots in Barr's April 3 memo.  *See Thornton*, 2020 WL 4368155, at *4 ("Without a doubt, Elkton has been one of the hardest-hit federal prison facilities in terms of Covid-19 . . . Despite these seemingly dire numbers, FCI Elkton has shown signs that the BOP measures designed to protect inmates . . .  are helping to curtail the spread of the virus . . . In short, although the evidence indicates that Defendant may face a greater risk of contracting Covid-19 at Elkton than at other locations, the degree of risk is not as high as Defendant suggests and appears to be diminishing daily even as cases of Covid-19 rise outside of the prison."); *United States v. Brinson*, Criminal No. 15-87, 2020 WL 4736258, at *3 (W.D. Pa. Aug. 14, 2020) (same).

As of August 20, 2020, 86 FCI Danbury inmates and 63 staff members have recovered from the virus, 1 inmate has sadly died from the virus, and 0 inmates and 1 staff member are currently positive for the virus.  *See* https://www.bop.gov/coronavirus/ (updated Aug. 20, 2020) (last visited Aug. 21, 2020).  In light of the BOP's successful mitigation strategies and the fact that zero prisoners currently have the virus at FCI Danbury, we hold that the conditions at FCI Danbury do not present an extraordinary and compelling reason justifying Ackerman's release.

In any event, "[t]he disturbing presence of COVID-19 at [a] prison . . . does not entitle every offender with a medical condition to compassionate release."  *Rodriguez*, 2020 WL 3447777, at *3; *see also Thornton*, 2020 WL 4368155, at *4 ("The existence of the virus in a

prison – even the level of infection at Elkton – is not sufficient to establish extraordinary and compelling circumstances without some proof that the defendant is at more severe risk for infection than his fellow inmates." (internal quotation marks and citations omitted)); *Brinson*, 2020 WL 4736258, at *3 (same); *accord United States v. Roeder*, 807 F. App'x 157, 161 n.16 (3d Cir. 2020) ("[T]he existence of some health risk to every federal prisoner as the result of this global pandemic does not, without more, provide the sole basis for granting release to each and every prisoner within our Circuit."); *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) (cautioning that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release."). Here, Ackerman has simply not demonstrated the "something more" required to show that his circumstances are so extraordinary and compelling that we should release him only halfway through his sentence. *See Rodriguez*, 2020 WL 3447777, at *3.

In so ruling, we do not intend to minimize the gravity of the situation, and we understand Ackerman's concerns for his health and safety. Indeed, COVID-19 has wrought havoc throughout the United States and the world. Nonetheless, for the reasons discussed at length above, we cannot conclude that the combination of Ackerman's medical conditions, his age, and the conditions at FCI Danbury are so extraordinary and compelling as to entitle him to compassionate release.

### B.  *Danger to the Community and 3553(a) Sentencing Factors*

Even if we found that Ackerman's high blood pressure, together with his age and the presence of COVID-19 at FCI Danbury, rose to the level of extraordinary and compelling reasons, those considerations would be outweighed by the § 3553(a) factors and the fact that Ackerman presents a danger to the community.

In determining whether a defendant presents a danger to the community, courts turn to the factors set forth in § 3142(g), which include the nature and circumstances of the crime charged, including whether the offense involves a minor victim; the defendant's history and characteristics; and his criminal history. *Justis*, 2020 WL 4365596, at \*4 (citing § 3142(g)(1), (3), (4)); *see also United States v. Sims*, Case No. CR18-0262JLR, 2020 WL 2838611, at \*5 (W.D. Wash. June 1, 2020).

Here, we disagree with Ackerman's bold assertion that he does not pose a danger to the community.  (Doc. No. 90 at p. 13.)  As we previously noted, Ackerman received, possessed, and traded thousands of images showing children engaging in sexual acts, which included sadistic and masochistic images. Without a doubt, Ackerman's behavior was predatory:  as the sentencing court observed, Ackerman actively sought out minors online, performed sex acts over the Internet for them, engaged in sexual chats with them online, and even attempted to meet an adolescent male at Lehigh Valley Mall.  (*See* Mar. 20, 2013 Sentencing Hearing Tr. at 269:1–6.)  His conduct was truly abhorrent.  If Ackerman were released from prison, he could again perpetrate the same crimes.  This is so because of their very nature.  As courts across the country have recognized, such crimes "do[] not require anything more than access to the internet."  *See United States v. Miezin*, Case No. 1:13CR15, 2020 WL 1985042, at \*5 (N.D. Ohio Apr. 27, 2020) ("In today's society with smartphones, tablets, laptops, smart TVs, and countless other devices, it would not be possible to place [a defendant] in home confinement and eliminate his ability to engage in prior criminal conduct."); *see also Sims*, 2020 WL 2838611, at \*6 (same); *United States v. Sears*, No. 19-cr-21 (KBJ), 2020 WL 3250717, at \*3 (D.D.C. June 16, 2020) (noting "the ease with which child pornography is accessible in the modern world" and observing that "[the defendant's] release is likely to require stringent and frequent monitoring.

17

This, too, poses a risk to the community, because the need for intensive monitoring in the age of COVID-19 would likely result in 'heightened safety risks . . . to the probation officers who would be tasked with monitoring his behavior.'" (citation omitted)).

Our conclusion that Ackerman still presents a danger to his community aligns with those of other courts presented with motions for compassionate release by child sex offenders. *See Miezin*, 2020 WL 1985042, at *5; *Sims*, 2020 WL 2838611, at *6; *see also United States v. Pitcock*, Case No. 15-cr-60222, 2020 WL 3129135, at *4 (S.D. Fla. June 12, 2020) ("Defendant pled guilty to the possession and transportation of child pornography, and he admitted to downloading, viewing, and transporting child pornography contained on numerous devices . . . A forensic examination of Defendant's computers and external drives revealed numerous videos and still images of children under the age of 18 engaged in sexual activity . . . [T]he Court has continuing concerns that this Defendant will reoffend. As such, the Court finds that Defendant's release to home confinement would pose a danger to the community."); *United States v. Mitchell*, No. 2:12-cr-0401, 2020 WL 2770070, at *4 (E.D. Cal. May 28, 2020) (holding that defendant, who had "been convicted of the serious crime of receipt of child pornography," had not "met his burden to show releasing him to home confinement will not pose a danger to the public"); *United States v. Hylander*, Case No. 18-cr-60017, 2020 WL 1915950, at *3 (S.D. Fla. Apr. 20, 2020) ("Defendant pled guilty to receipt of child pornography, and he admitted to downloading and viewing child pornography from a computer inside his home . . . A computer forensic examination of Defendant's computers and external drives revealed over 600 videos of children under the age of 18 engaged in sexual activity . . . [T]he Court finds that Defendant's release to home confinement would pose a danger to the community."); *accord United States v. Schultz*, 17-CR-193S, 2020 WL 2764193, at *7–8 (W.D.N.Y. May 28, 2020) ("[The defendant]

preyed on a 'girl' whom he solicited online and thought was a 15-year-old high school student. He sent this 'girl' numerous sexually explicit messages, describing in great detail the sexual acts he would perform on her and that she should perform on him . . . [The defendant's] conduct . . . demonstrate[s] that he poses a significant danger to the community.").

Finally, we must consider the § 3553(a) factors, which include, *inter alia*:  the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public from future crimes by the defendant; and the need to avoid unwarranted sentencing disparities.  *Pawlowski*, 967 F.3d at 330 (citation omitted); *Thornton*, 2020 WL 4368155, at *5.

Ackerman asserts that he has taken steps to rehabilitate himself in prison, including completing the Skills, Anger Management, and Resolve Programs.  (Doc. No. 90 at pp. 14–15.) Ackerman has no prior criminal history (*see* PSR at pp. 11–12), and he has not been subject to any disciplinary action during his incarceration (*see* Doc. No. 90 at p. 16; Doc. No. 99 at p. 4). Ackerman asserts that he has been a model inmate, taking multiple Adult Continuing Education courses, serving as an active member of the Roman Catholic Church at FCI Danbury, and maintaining full-time employment.  (Doc. No. 90 at pp. 15–16.)  While we applaud the steps Ackerman has taken towards rehabilitating himself, we find that such efforts, coupled with his lack of criminal history, still do not outweigh the other § 3553(a) factors.  *See United States v. Mortenson*, Case No. 2:11-cr-00095-JAD-CWH, 2020 WL 2549970, at *2 (May 19, 2020) (denying the defendant's compassionate release motion, where the defendant was a model inmate and had no criminal history, reasoning that the "seriousness of his conviction [receipt of child pornography]" and the "predatory nature of [defendant's] conduct" "[could] not be

overlooked").

As noted above, the nature and circumstances of Ackerman's conviction are horrifying. As the sentencing court explained, Ackerman "enjoy[ed] watching the innocence of young children shattered; their intimate privacy destroyed" and "exploit[ed] the worst moments of their young lives, their sexual abuse" for his "own sexual gratification." (Mar. 13, 2013 Sentencing Hearing Tr. at 292:6–293:21.) Like the sentencing court, we cannot overemphasize the seriousness of Ackerman's crime; indeed, "[e]ach time he downloaded, saved, and viewed an image of one of the worst days of a child's life, he re-victimized that child." (*Id.* at 295:4–296:1.) Further, Ackerman has only served about half of his 210 month sentence. *See Pawlowski*, 967 F.3d at 331 (holding that "the time remaining in [the] sentence may . . . inform whether immediate release would be consistent with the § 3553(a)) factors"). Granting Ackerman compassionate release at this stage would not reflect the seriousness of his crimes, promote respect for the law, provide just punishment, afford adequate deterrence, or protect the public from future crimes by him, nor would it prevent sentencing disparities.

Again, as to the § 3553(a) factors, our holding is consistent with other courts considering compassionate release motions by defendants convicted of similar charges. *See United States v. Johnson*, Case No. 2:16-cr-00068-DN, 2020 WL 3470262, at *4 (D. Utah June 25, 2020) (holding that the § 3553(a) factors weighed against granting the defendant compassionate release, where the defendant had been convicted of possession of child pornography and had possessed "over 600 images that involved a prepubescent minor" and "portrayed sadistic or masochistic conduct, or other depictions of violence"); *Hylander*, 2020 WL 1915950, at *3; *Schultz*, 2020 WL 2764193, at *7 (noting that reducing the defendant's sentence from 87 months to time served (38 months) would not reflect the seriousness of the crime and would result in

20

unwarranted sentencing disparities, where the defendant pled guilty to attempted receipt of child pornography); *Justis*, 2020 WL 43655596, at \*4 (concluding that the 168 month sentence imposed reflected the serious nature of child sex trafficking offense and that granting release when defendant has only served about one-third of his sentence would undermine the need for the sentence to reflect the seriousness of the offense); *accord United States v. Smith*, No. 3:16-cr-48 (MPS), 2020 WL 1903160, at \*4 (D. Conn. Apr. 17, 2020).

## IV.   Conclusion

For the foregoing reasons, we deny Ackerman's Emergency Motion for Reduction in Sentence Under §3582(c)(1)(A)(i).

An appropriate order follows.